UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
:
VANDERDONK, LLC, :
:
:
Plaintiff, :
: **COMPLAINT FOR**
-against- : **INJUNCTIVE AND OTHER**
: **RELIEF**
AVI MAHAJAN, :
: **JURY TRIAL DEMANDED**
Defendant. :
:
------------------------------------------------------------------ X

Plaintiff, Vanderdonk, LLC ("Plaintiff"), by and through its undersigned attorneys, Rottenberg Lipman Rich, P.C., alleges as follows for this complaint against defendant, Avi Mahajan ("Mahajan").

NATURE OF THE ACTION

1. Plaintiff brings this action for violations of the Defend Trade Secrets Act of 2016 ("DTSA") and violations of New York common law regarding the misappropriation of trade secrets.

2. This action concerns Mahajan's blatant and illegal misappropriation of highly confidential and proprietary computer code originally developed by Plaintiff's principal and founder, David Sweet ("Sweet").

3. While employed as a research analyst and trader at the quantitative trading firm DRW Holdings, LLC ("DRW"), Mahajan had access to proprietary and confidential computer code developed by Sweet, owned by Plaintiff, and used by DRW (as licensee) in its trading strategies. Due to the value of Plaintiff's code and other confidential information maintained on its servers, as well as the ease with which computer code can be misappropriated without

safeguards in place, DRW maintained strict protocols relating to accessing, using, sharing, copying, and modifying such code.

4. In knowing and blatant disregard of DRW's policies prohibiting such conduct, in May 2023 Mahajan wrongfully copied and uploaded to a remote site all or a portion of Plaintiff's code, which Sweet had spent many months writing and then licensed to DRW and which Mahajan recognized as code that DRW developed for use by DRW's Systematic Americas Equities Trading desk.

5. When Mahajan's actions were discovered and Sweet confronted him about them, Mahajan admitted that he had taken Plaintiff's code but otherwise dissembled about his conduct, including by claiming that he did not intend to take the code but was compelled to do so because he was experiencing a bipolar episode. Mahajan further lied to Sweet in rather obvious ways about how he had copied the code, whether he deleted the code, etc.

6. After DRW investigated Mahajan's conduct and evaluated Mahajan's explanations for it, DRW terminated Mahajan and escorted him from DRW's building on July 24, 2023.

7. By this action, therefore, Plaintiff seeks (1) an Order permanently enjoining Mahajan from in any way using, copying, or distributing Plaintiff's code or a derivative work developed from Plaintiff's code; (2) a monetary award to compensate Plaintiff for Mahajan's misappropriation of Plaintiff's code in an amount to be determined at trial but believed to exceed $2.5 million; (3) an award of exemplary damages due to the intentional bad-faith nature of Mahajan's conduct; and (4) an award of attorney's fees and costs related to this action.

**THE PARTIES**

8. Plaintiff is a limited liability company organized under the laws of the State of Delaware. Plaintiff was founded by Sweet in 2021 and Sweet assigned to Plaintiff all of Sweet's rights and interests to the programming code that is the subject of this litigation.

9. Mahajan is an individual residing at 140 Saint James Pl., Unit 3F, Brooklyn, NY 11238. On information and belief, DRW hired Mahajan in July 2018 as a Quantitative Trading Analyst. DRW terminated Mahajan on July 24, 2023.

**JURISDICTION AND VENUE**

10. The Court has original jurisdiction pursuant to 28 U.S.C. § 1331, because this action involves a claim arising under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832, et seq. (the "DTSA"). This Court also has supplemental jurisdiction over Plaintiff's 'claim under New York common law pursuant to 28 U.S.C. § 1367 because that claim is sufficiently related to Plaintiff's DTSA claim as to form part of the same case or controversy.

11. This Court has personal jurisdiction over Mahajan because he is a resident of the State of New York.

12. This Court is the proper venue for this action, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

**BACKGROUND**

13. Sweet received a B.A. in Physics and Mathematics from Duke University in 1995. He received a Ph.D. in Physics from the University of Maryland in 2000. Since 2000, he has worked principally for trading firms, including numerous firms focusing on quantitative trading of publicly traded securities. Sweet also serves as an adjunct professor at Yeshiva

University, teaching a class and advising AI masters students in their independent study and research.  In February 2023, DRW hired Sweet as a Lead Quantitative Researcher.

14.     One area of specialization developed by Sweet in both his professional work and academic research is Bayesian optimization.  Bayesian optimization is a collection of methods for optimizing engineered systems and automating experiment design. These methods may be applied to a variety of scientific and engineering endeavors, including quantitative trading, recommender systems, artificial intelligence, software and hardware tuning, materials science, and high-energy physics.

15.     Sweet's interest in and study of Bayesian optimization resulted in his creation of a considerable amount of proprietary intellectual property.  Among other things, Sweet maintains the website cogneato.xyz, a Bayesian optimization web tool designed for personal and educational use.  Sweet published the book <u>Experimentation for Engineers: From A/B testing to Bayesian Optimization</u>, which teaches experimental optimization methods and serves as the textbook for the class he designed and teaches at Yeshiva University.  He uses cogneato.xyz as a teaching tool in this class.  He is currently preparing, with a Yeshiva graduate student, a manuscript that describes original research into Bayesian optimization algorithms.  Furthermore, Sweet has written a considerable amount computer code, using the Python programming language and the BoTorch library, implementing Bayesian optimization algorithms.

16.     Sweet's most significant Bayesian optimization implementation is a system that he named "Cogneato."  During 2022, Sweet spent approximately six months developing Cogneato by researching and evaluating journal articles, textbooks, and preexisting software; building a proprietary simulation and evaluation system; running tens of thousands of cpu-hours of simulations; implementing recently-published algorithms that are not yet available in other

software; devising novel algorithm improvements; and proposing and evaluating – but mostly rejecting -- countless modifications, in short, "finding the needles in the haystack" that make Cogneato effective. Additionally, Cogneato contains unique and proprietary rules-and inference-based methods of adapting the optimization algorithm to a user's problem specification and measurements. Results displayed on cogneato.xyz show that Cogneato outperforms the popular state-of-the-art optimization tools, pycma (github.com/CMA-ES/pycma) and Ax (ax.dev). All of the person-time and compute-time used to create Cogneato was funded by Sweet.

17. In 2021, Sweet formed Plaintiff and has assigned some of his intellectual property to Plaintiff, including Sweet's interest in Cogneato.

18. Cogneato is Plaintiff's proprietary intellectual property and it contains valuable trade secrets that are not publicly known. The Cogneato intellectual property derives its value not only from the extant code but also from the many decisions to reject the features, hypotheses, and settings that were deemed (by the proprietary simulation and evaluation system) to be inadequate. Plaintiff and Sweet have carefully guarded Cogneato, maintained Cogneato only in secure password-protected locations, and shared Cogneato with others only pursuant to written agreements imposing confidentiality requirements.

19. As part of his interview process with DRW, Sweet pitched DRW on the ideas underlying Cogneato and their potential application to DRW's trading systems. These ideas were vetted by DRW's most senior quantitative researcher and resulted in an offer to run DRW's trading desk, Systematic Americas Equities ("SAMEQ"), with the title Lead Quantitative Researcher. Sweet approached DRW about incorporating Cogneato directly into his work on SAMEQ while still retaining his ownership rights in Cogneato.

20. On April 5, 2023, DRW and Sweet entered into an Employee Intellectual Property letter agreement (the "EIP Agreement") whereby the parties identified Sweet's Cogneato code, agreed that Sweet and DRW would be jointly using Cogneato for DRW projects, and acknowledged Sweet's continued ownership of Cogneato despite the use of Cogneato at DRW.

21. The IPL Agreement referred to Cogneato as the "Employee IP" and reserved all of Sweet's existing ownership rights in the Employee IP. The EIP Agreement recounts that Sweet informed DRW of his pre-existing rights in the Employee IP and that he intended to use the Employee IP in his employment with DRW:

> You have informed DRW that, notwithstanding Section 5 of the Restrictive Covenant Agreement, you will use certain pre-existing methods, processes, ideas, know-how, techniques, models, strategies, software, formulas, data, inventions (whether or not patentable), technology or work (whether or not copyrightable) in connection with your employment at DRW, as more specifically described on Attachment A thereto ("Employee IP").

22. The EIP Agreement defined Employee IP as follows, which definition accurately describes Cogneato:

> The Employee IP is code relating to an auto-configuring Bayesian optimizer that includes an optimization engine and a web server front end/API. You agree that the Employee IP will be delivered to Bill Wiley via a TGZ file promptly following execution of this Agreement.

23. The EIP Agreement provides that Sweet shall have continued ownership rights in the Employee IP and may continue to use, for himself or others, the Employee IP:

> For the avoidance of doubt, the termination of your employment with DRW will not affect your right, title and interest in the Employee IP as it existed as of the start of your employment with DRW.

> . . . should your employment with DRW end for any reason . . .
> you may use the Employee IP in connection with trading on your
> own account or on the accounts of third parties . . .

24. As provided in the EIP Agreement's definition of "Employee IP," immediately following the execution of the EIP Agreement, Sweet transferred to DRW's Bill Wiley the Employee IP which consisted of the Cogneato code.  The Employee IP consisted of a snapshot of Sweet's personal source code repository (usually called a "repo" for short) containing Python code, representing a tuned Cogneato Bayesian optimization engine, all of which was Sweet's original work product. The Employee IP was copied into the SAMEQ team's DRW-owned repo, which is named sameq. After entering the EIP Agreement, Sweet assigned his rights and interests in Cogneato to Plaintiff.

Sweet Works with Mahajan

25. After joining DRW and starting work on SAMEQ, Sweet started to work with Mahajan. Sweet worked as the Lead Quantitative Researcher on SAMEQ and Mahajan briefly assisted Sweet as a Quantitative Trading Analyst.

26. At Mahajan's request, Sweet presented Mahajan with a detailed whiteboard lecture regarding Sweet's approach to applying Bayesian optimization to trading in SAMEQ. Sweet also recommended that Mahajan experiment with the free web tool at cogneato.xyz and read Sweet's book <u>Experimentation for Engineers: From A/B testing to Bayesian optimization</u> as ways to familiarize himself with Bayesian optimization

27. While Mahajan knew that Sweet had written Cogneato and incorporated it into the SAMEQ code, Sweet did not discuss with Mahajan that Sweet and DRW had entered the EIP Agreement governing DRW's use of Cogneato.  Upon information and belief, however, Mahajan

realized the value of applying Bayesian optimization to the SAMEQ code and realized that Cogneato was an effective tool for Bayesian optimization.

Mahajan's Misappropriation and Use of Cogneato

28. On May 23, 2023, Mahajan wrongfully transferred portions of the SAMEQ code, including portions of Cogneato, to a remote, password-protected account that Mahajan maintained on the popular code-hosting platform Github. Mahajan had no legitimate reason for moving the code to Github. Github is a popular hosting service for source code repositories ("repos") managed with a computer program called "git". It offers free storage space, security features, and many add-on services. It also serves as a tool for source code discovery and distribution. DRW incurs considerable expense to license and deploy Github Enterprise, a version of Github that companies may deploy internally to host and safeguard proprietary software for the express purpose that all code be maintained internally at DRW.

29. At some point prior to June 14, 2023, DRW's Information Security team detected that on May 23, 2023 Mahajan had engaged in suspicious activity involving access to github.com.

30. DRW's Head of Quantitative Trading then (i) provided Sweet with a sample of code that was suspected to have been taken by Mahajan, which Sweet immediately recognized as being part of the Cogneato code, and (ii) relayed to Sweet that Mahajan had also taken dk.py, a DRW project built using Cogneato ("DK"). Sweet ran a comparison of the relevant portions of the Cogneato code provided by DRW's Head of Quantitative Trading against the Cogneato code maintained at DRW and confirmed that portions of two code bases matched character-for-character. The exact match strongly suggests that Mahajan copied source code files from Cogneato and other SAMEQ DRW code.

Mahajan Admits Misappropriating Sweet's Code

31. On the morning of July 10, 2023, Sweet confronted Mahajan about Mahajan's theft of Cogneato. Mahajan acknowledged that he had taken portions of Cogneato and DK, but initially claimed that the code was no longer available to him because he had deleted it from Github. Sweet, however, asked Mahajan to show him where he had saved the code on Mahajan's Github. In viewing Mahajan's account, Sweet observed that while Github superficially indicated that the relevant file was deleted it was, in fact, still recoverable, and Sweet watched as Mahajan easily recovered it.

32. The recovered repo was named "sameq," the same name as is used internally at DRW. Mahajan added to the repo the description, "BoTorch for systematic American equities", a reference to the DRW team SAMEQ. Alarmingly, Mahajan's Github account reflected that Mahajan had identified himself as the author/owner of the code by noting "Copyright 2023 Avi Mahajan." Mahajan further identified that he would grant an "MIT License" in the code to other users. An "MIT License" is a popular form of copyright license used with respect to the distribution of open-source code. Mahajan's assertion of a copyright interest in the code together with his apparent intent to distribute the code pursuant to an MIT License was extremely troubling to Sweet because it obviously indicated that (1) Mahajan wrongfully claimed to be the author of the code and (2) intended freely to distribute the code to others.

33. The repo saved to Mahajan's Github account further presented the same subdirectory names and hierarchical structure and the same file names as the repo maintained on DRW's system. The contents of the files were indistinguishable from the originals. Additionally, the repo even contained small, peripheral, administrative files – ex., "lint.sh", "ruff.toml", and "pytest.ini" – which one would tend to ignore (or, at least, save for last) if one

were copying manually and/or piecemeal due to the high cost of making copies by these methods. In contrast, if one were copying an entire repo using standard electronic tooling, it would actually be harder to ignore these small files. It would be easier to command a computer to just "copy everything".

34. Fortunately, Sweet recorded his July 10, 2023 discussion with Mahajan because Mahajan would later, through his attorney, deny material parts of the discussion.

35. The transcript of Sweet's recording conclusively establishes that Mahajan misappropriated Cogneato. (Note that the term "gist' used below, refers to a Github service designed to make it easy to share code by cutting and pasting.)

| | |
|---|---|
| Sweet: | So what did you upload? |
| Mahajan: | I just uploaded like, so I wrote my own like little neural net thing and then I wanted to basically do the sort of thing that you were doing, on my own. That's what I uploaded. |
| Sweet: | No, what code did you upload? |
| Mahajan: | Very similar to the DK code. That's what I uploaded like just taking like the same sort of parameters that you had with the sort of machine learning I was working on. |
| Sweet: | Well, how similar? Did you upload my code? |
| Mahajan: | I did not upload your code. I uploaded a version of your code that I took from your repo. |
| Sweet: | So you took my code and modified it and then uploaded it? |
| Mahajan: | Yes. |
| Sweet: | What code? |
| Mahajan: | Part of the Cogneato code |
| Sweet: | What part? |

| | |
|---|---|
| Mahajan: | The, like, the sampling and the sort of Bayesian optimization you're working on. |
| Sweet: | I, I mean, Cogneato is a Bayesian optimizer, so that's the whole thing. |
| Mahajan: | Right, and I just wanted to modify some of the parameters there. Because, you know, I don't really know too much about this. I don't have my PhD or anything, I was just trying to learn it . . . I understand like they literally scrape this for the AI and I don't want your shit being stolen so… |
| Sweet: | Well, it was stolen. I mean you took it. So that's, that, you know, that ship has sailed.  Have you taken code from DRW before? |
| Mahajan: | Only stuff that I've written.  Just like things that I want and I just put it on my, like, a gist or something, like, hey, this is a piece of code that I really liked.  So like actions on a [inaudible] essentially. |
| Sweet: | So DRW gives you a computer and fantastic computing resources like I've never seen before . . . So why did the code need to be on your GitHub for you to learn from it? |
| Mahajan: | That's exactly the question I was asking myself. |
| Sweet: | We literally have a GitHub Enterprise here. |
| Mahajan: | I understand.  That's why I deleted it immediately. It was an impulsive action, and I wasn't fully thinking at the moment. That's 100% what happened. I just wasn't thinking. It wasn't, was completely my fault. No, no excuse. That's why I called [DRW's Head of Quantitative Trading]. That's why I did everything, like 100% . . . |
| Sweet: | Right. Thank you. |
| Mahajan: | Yeah, no problem. |

36.     Mahajan specifically acknowledged taking code related to DK, sampling, and optimization. DRW's Head of Quantitative Trading had also informed Sweet that Mahajan had taken DK-related code. However, while Cogneato-related code was visible to Sweet in

Mahajan's Github repo, DK-related code was not. These facts suggest that Mahajan stored DK code elsewhere, possibly with another copy of the repo, and possibly with more files taken from the DRW sameq repo. This would be consistent with the workflow required to create a Github repo: The user prepares files locally on a computer then uploads ("pushes") some or all of them to Github. All of this, combined with the presence of files not specifically related to optimization (ex., lint.sh, etc.) suggest that Mahajan was thorough in copying the sameq repo from DRW's computer systems to his own.

37. Importantly, Sweet viewed Mahajan's Github repo, sameq, at its final "commit". A commit refers to any change made to a repo. A feature of Github is that every commit from the time of repo creation is recorded. The earliest commits show Mahajan adding files. Later commits show Mahajan removing files and overwriting files with empty files of the same name. Were one to view only the final commit – the final state of the repo – one would see less IP than was actually uploaded.

38. Sweet met with Mahajan again on the afternoon of July 10, 2023, and Mahajan allowed Sweet to access Mahajan's GitHub account where he had saved the code. Sweet again recorded the conversation with Mahajan that transpired as Sweet reviewed the code that Mahajan had improperly saved on GitHub. During this exchange, Mahajan improbably claimed to have typed, character-by-character, all the code that he had misappropriated rather than copying it by some other method. Mahajan also self-servingly claimed, for the first time, that a recently-diagnosed bipolar disorder compelled him to take the code, disclaiming responsibility for his actions:

> Sweet:     You typed all of this in?

    Mahajan:      I did.  Dave, I was diagnosed with bipolar last year, and these things happen to me occasionally.  I just, yeah, I did.

    Sweet:         What were you gonna do with "chex_stats"?

    Mahajan:      Dave, I was diagnosed with bipolar. It's an impulse thing. I accidentally did it. I was just typing. And that's the problem. I was like, okay. Like, it happened without thinking. I just went and I did it. It's why I tried to throw away my computer-- not throw away, but not use my computer outside of work hours.

    Sweet:         Really?  [indicating surprise to see further Cogneato code on Mahajan's account]

    Mahajan:      Dude, I'm sorry.  How much is it worth to you?

39.    Following these discussions with Mahajan, Sweet was extremely concerned about Mahajan's conduct.  Mahajan's claim to have manually typed the misappropriated code without error is fantastical based on the simple fact that the probability of perfect reproduction decreases exponentially in the length of the file being typed, but it is made more preposterous by the fact that Python code is sensitive to whitespace formatting – precisely counted strings of spaces or tabs – the exact nature of which is not uniquely discernable on-screen to the naked eye.  Sweet compared the code segments that were recovered by DRW's security system and found them to be exact matches to Cogneato code saved on DRW's internal systems.

40.    Further, Mahajan repeatedly changed his explanation for his conduct.  He initially sought to portray his conduct as innocent curiosity, or even admirable dedication to learning his craft.  "I wanted to basically do the sort of thing that you were doing, on my own . . . Because, you know, I don't really know too much about this.  I don't have my PhD or anything, I was just trying to learn it."

41.    Mahajan even claimed that one of his concerns was protecting Cogneato from being stolen: "I don't want your sh*t being stolen so…"

42. However, when Sweet pointed out that there were sophisticated resources within DRW that could facilitate Mahajan's asserted aspiration to learn more about Bayesian optimization, Mahajan changed his story and started to claim that he acted because of irrational and uncontrolled impulses caused by his recently diagnosed bipolar disorder:

> Dave, I was diagnosed with bipolar. It's an impulse thing. I accidentally did it. I was just typing. And that's the problem. I was like, okay. Like, it happened without thinking. I just went and I did it. It's why I tried to throw away my computer-- not throw away, but not use my computer outside of work hours.

43. Further, when Sweet pressed Mahajan about what Mahajan had done and why, Mahajan stopped responding and resorted to asking Sweet how much money Sweet wanted to drop the issue. "Dude, I'm sorry. How much is it worth to you?"

44. Mahajan also signed an agreement with DRW in which he attests to deleting the sameq repo from Github. However, as set forth above, it was determined that Mahajan did not actually delete the repo. As a remedy for Mahajan's refusal to accurately account for his actions with respect to the repo, DRW demanded Mahajan transfer ownership of the Github sameq repo to DRW, which he did on July 28, 2023.

45. On August 1, 2023, moreover, Mahajan informed Sweet by email that the sameq repo contains 13,000 lines of code. Sweet verified that this is correct by inspecting the repo on a DRW-owned computer. Sweet, however, had revoked Mahajan's access to the sameq repo in early July, after first learning about the incident and before confronting Mahajan. This revocation should have marked the last time Mahajan had access to the repo. Yet, despite having no access to the DRW repo, despite being discharged from DRW on July 24, and despite transferring ownership of his Github copy of sameq to DRW on July 28, Mahajan was still somehow able to accurately report that there are 13,000 lines of code in the sameq repo on August 1. This fact,

along with the evidence in the commit history of his attempts to minimize his actions; the presence of small, administrative files (ex., lint.sh) in his repo; his confession to taking specific software (DK) that did not appear at all in his repo's commit history; and Mahajan's pattern of lying (as demonstrated by the transcripts of the recordings) suggests that Mahajan possessed and may still possess a complete, private copy of the sameq repo, which includes Cogneato.

46. Further, while Sweet was not involved with conducting DRW's investigation of Mahajan's conduct, DRW appears to have summarily discharged Mahajan on July 24, 2023 as the result of that investigation.

47. Finally, in the recorded conversation, Sweet, referring to the critical portion of Cogneato that Mahajan had stolen, stated, "I mean … that's the whole thing" to which Mahajan responded, "Right."

## COUNT I
### (Misappropriation of Trade Secrets)
### (18 U.S.C. §1836 (the "DTSA"))

48. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 47 of the Complaint as if fully set forth herein.

49. Cogneato and the related code is a trade secret as defined by the DTSA. The information in Cogneato took many months to develop, is not available to or known by the general public, and Plaintiff, Sweet, and DRW take significant measures to protect Cogneato from disclosure.

50. Mahajan knowingly misappropriated Cogneato by wrongfully transferring Cogneato outside of DRW in disregard of DRW's policies and practices and in violation of Mahajan's contractual obligations to DRW requiring him to protect DRW confidential information and use DRW confidential information only for bona fide DRW purposes.

51. Mahajan then improperly used Cogneato by modifying it and studying and, by his own admission, attempting to learn more about how it works and what he could do with it.

52. Under 18 U.S.C. § 1836(b)(3), this Court may grant injunctive relief to prevent any actual or threatened misappropriation of trade secrets.

53. Mahajan's conduct of improperly copying Cogneato from DRW's servers and improperly saving Cogneato on his own personal account outside of DRW presents a credible threat that Mahajan has retained a copy of Cogneato and has copied and distributed Cogneato to others and may continue to do so in the future.

54. Accordingly, Plaintiff requests that this Court enter an order enjoining Mahajan from using or disclosing Cogneato, or any derivative work created from Cogneato, in any manner in the future.

55. Plaintiff also requests that this Court enter an order requiring Mahajan to return all copies of Cogneato or any derivative work created from Cogneato, as provided by 18 U.S.C. § 1836(b)(3)(A)(ii).

56. Plaintiff further requests an award of compensatory damages under 18 U.S.C. §1836(b)(3)(B) together with an award of exemplary damages and attorneys' fees under 18 U.S.C. §1836(b)(3)(C) because Mahajan's misappropriation of Sweet's trade secrets was willful and malicious.

## COUNT II
### (Common Law Misappropriation of Trade Secrets)

57. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 56 of the Complaint as if fully set forth herein.

58. Cogneato and the related code is a trade secret owned by Plaintiff under New York law.  The information in Cogneato took many months to develop, is not available to or known by the general public, and Plaintiff, Sweet, and DRW take significant measures to protect Cogneato from disclosure.

59. Mahajan knowingly misappropriated Cogneato by wrongfully transferring Cogneato outside of DRW in disregard of DRW's policies and practices and in violation of Mahajan's contractual obligations to DRW to protect DRW confidential information and use DRW confidential information only for bona fide DRW purposes.

60. Mahajan then improperly used Cogneato by modifying it and studying and, by his own admission, attempting to learn more about how it works and what he could do with it.

61. Under New York law, this Court may grant injunctive relief to prevent any actual or threatened misappropriation of trade secrets.

62. Mahajan's conduct of improperly copying Cogneato from DRW's servers and improperly saving Cogneato on his personal account outside of DRW presents a credible threat that Mahajan has copied and distributed Cogneato to others and may continue to do so in the future.

63. Accordingly, Plaintiff requests that this Court enter an order enjoining Mahajan from using or disclosing Cogneato, or any derivative work created from Cogneato, in any manner in the future.

64. Plaintiff also requests that this Court enter an order requiring Mahajan to return any and all copies of Cogneato or any derivative work created from Cogneato.

65. Plaintiff further requests an award of compensatory damages, as well as exemplary damages, as permitted by New York law.

**WHEREFORE,** Plaintiff respectfully request that this Court:

1. Enter an Order permanently enjoining Mahajan, and all persons and/or entities acting on his behalf, for his benefit, or in active concert or participation with him (including any agents, representatives, associates and/or employees), from disclosing Cogneato or any derivative work created from Cogneato to anyone other than Plaintiff;

2. Enter an Order permanently enjoining Mahajan, and all persons and/or entities acting on his behalf, for his benefit, or in active concert or participation with him (including any agents, representatives, associates and/or employees), from using, possessing, or having access to Cogneato; and

3. Enter an Order directing Mahajan to immediately return to Plaintiff all copies of Cogneato or any derivative work created from Cogneato in his possession, custody or control;

4. Award Plaintiff compensatory damages in an amount to be determined at trial but believed to exceed $2,500,000;

5. Award Plaintiff exemplary damages;

6. Award Plaintiff the costs and expenses, including reasonable attorneys' fees, of this litigation; and

7. Award Plaintiff such other relief as the Court may deem just and proper.

Dated: September 5, 2023
New York, New York

ROTTENBERG LIPMAN RICH, P.C.

By: _____
Harry W. Lipman
Thomas E. Chase
The Helmsley Building

230 Park Avenue, 18th Floor
New York, New York 10169
(212) 661-3080

Attorneys for Plaintiff, Vanderdonk, LLC